UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
                                                           :
KRISTEN HAIGHT,                                            :
                              Plaintiff,                   :
                                                           :        13 Civ. 04993 (LGS)
              -against-                                    :
                                                           :        OPINION AND ORDER
NYU LANGONE MEDICAL CENTER, INC., et                      :
al.,                                                       :
                              Defendants.                  :
                                                           :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

    Plaintiff Kristen Haight brings claims for 1) negligent supervision or retention of an unfit

employee and negligence; 2) quid pro quo sexual harassment; 3) hostile work environment sexual

harassment; 4) age discrimination; 5) termination in order to prevent employee from obtaining

pension benefits; 6) disability discrimination and failure to provide a reasonable accommodation;

7) sexual orientation discrimination; and 8) religious discrimination against Defendants NYU

Langone Medical Center, Inc., NYU Medical Center and NYU School of Medicine (together,

"NYU") and a claim for negligent supervision or retention of an unfit employee and negligence

against Defendants Medtronic, Inc. and ConsignMed, Inc.[1]

    NYU has moved to dismiss all of Plaintiff's claims pursuant to Federal Rule of Civil

Procedure ("FRCP") 12(b)(6).  For the reasons discussed below, NYU's motion to dismiss is

granted in part and denied in part.

    Medtronic has moved to dismiss the claim against it under FRCP 12(b)(6) or, in the

alternative, for summary judgment pursuant to FRCP 56.  Medtronic's motion to dismiss is

denied, and Medtronic's motion for summary judgment is denied.

---

[1] ConsignMed has not appeared and apparently has never been served in this matter.

## I.     Background

### A.  Procedural History

Plaintiff filed her original Complaint in New York State Court on September 2, 2011, asserting claims against both NYU and Medtronic for 1) breach of contract; 2) breach of implied employment contract in employee handbook; 3) tortious interference with prospective economic advantage; 4) defamation; 5) implied covenant not to terminate; 6) intentional infliction of emotional distress; 7) negligent supervision or retention of an unfit employee and negligence; and 8) prima facie tort.  NYU moved to dismiss the Complaint, and Plaintiff cross-moved to amend. Both NYU and Medtronic consented to Plaintiff's request to amend.

Plaintiff filed her First Amended Complaint on January 27, 2012, asserting the same eight claims, as well as additional claims for 1) quid pro quo sexual harassment; 2) hostile work environment sexual harassment; and 3) whistleblower protection against both NYU and Medtronic.  Both NYU and Medtronic moved to dismiss the First Amended Complaint, and Plaintiff cross-moved to amend.

On July 5, 2012, the parties entered into a stipulation whereby Defendants withdrew their motions to dismiss and consented to Plaintiff's request to amend provided that 1) Plaintiff's Second Amended Complaint could contain only causes of action for discrimination under New York City and State Human Rights Laws and constitutional protections, recovery of benefits under a pension plan, and negligent supervision of an employee and 2) Defendants reserved the right to assert any and all defenses against the Second Amended Complaint, including the defense that Plaintiff had waived all other claims when she included a whistleblower claim under the New York Labor Law in her First Amended Complaint.

Plaintiff filed her Second Amended Complaint on June 17, 2013, asserting claims against NYU, Medtronic, and ConsignMed for 1) negligent supervision or retention of an unfit employee and negligence; 2) quid pro quo sexual harassment; 3) hostile work environment sexual harassment; 4) age discrimination; 5) termination in order to prevent employee from obtaining pension benefits; 6) disability discrimination and failure to provide a reasonable accommodation; 7) sexual orientation discrimination; and 8) religious discrimination.

On June 28, 2013, Medtronic's counsel sent Plaintiff's counsel a letter pursuant to 22 N.Y.C.R.R. 130.1, demanding that Plaintiff withdraw all claims against Medtronic because they lacked any factual or legal merit.  On July 15, 2013, Plaintiff's counsel responded, agreeing to dismiss all claims against Medtronic other than the negligent supervision claim.

On July 16, 2013, NYU removed this action to the Southern District of New York on the grounds of federal question jurisdiction based on Plaintiff's ERISA-based claim, and Medtronic consented to removal.  On September 19, 2013, Plaintiff filed her Third Amended Complaint ("Complaint"), which asserts all eight claims contained in the Second Amended Complaint against NYU and one claim against Medtronic and ConsignMed for negligent supervision or retention.

### B.  Facts

The facts are taken from the Complaint and, as is required on this motion, assumed to be true.

Defendant NYU is a hospital and medical facility in New York City.  Defendants Medtronic and ConsignMed are vendors that do business with NYU.  Plaintiff Kristen Haight is forty-one years old and was employed by NYU for nineteen years as a pediatric nurse.  Beginning in 2003, Plaintiff was harassed and discriminated against by various NYU employees, including

by a co-worker named Michelle Blate.  Ms. Blate was employed by NYU from January 1995 through December 2009 and employed by Medtronic and Consignmed from January 2010 through the time Plaintiff filed her Complaint.

Plaintiff began having problems with Ms. Blate in 2005, which included Ms. Blate 1) discussing Plaintiff's medical problems with other NYU employees; 2) attempting to get Plaintiff fired because Plaintiff was not returning her late night phone calls and was otherwise refusing her advances; and 3) putting her hands down Plaintiff's underwear to adjust a label without Plaintiff's consent, which incident Plaintiff reported to NYU, but no action was taken.

Sometime in 2005 or 2006, Plaintiff requested that a security seal be placed on her medical record on the NYU computer system, which request was denied.  Then, in 2007, Plaintiff became ill and needed surgery, so she pursued medical care outside of NYU.  However, on January 10, 2008, Plaintiff's medical problems, which were gynecological, worsened, and she started treatment at NYU.  Plaintiff requested that certain information be left out of her chart due to fear that her co-workers would find it, and the attending doctor agreed to leave out anything that would pique others' curiosity.

In the fall of 2008, Plaintiff discussed her concerns about being a patient at NYU and the potential privacy violations that might occur with her supervisors, Maria Brillant and Phyllis Marchitelli.  These supervisors assured Plaintiff that NYU would protect Plaintiff's privacy, that she did not need to change her name on her medical chart, and that a Health Insurance Portability and Accountability Act ("HIPAA") investigation would be implemented.  Nevertheless, on December 11, 2008, Plaintiff told her surgeon at NYU that she wanted to change her name on her medical chart.  The same day, in a conversation with one of Plaintiff's supervisors, Dr. Jeffrey

4

Wisoff, Plaintiff's surgeon commented that Plaintiff's surgery was similar to a procedure that Dr. Wisoff's daughter had had.

On January 4 and 5, 2009, Ms. Blate breached security and entered Plaintiff's medical chart electronically.  These breaches were revealed by a later NYU investigation.

On January 5, 2009, the day of Plaintiff's surgery, Dr. Wisoff told Plaintiff's co-workers that she was having minor surgery and would be back in a few weeks, even though Plaintiff had asked him not to say anything to anyone about her surgery.  On the same day, Dr. Wisoff's wife called Plaintiff's surgeon's secretary and asked whether Plaintiff was in recovery and then came to the recovery room to see Plaintiff.  Plaintiff was admitted to the floor of the hospital on which her team worked.

During her medical leave, Dr. Wisoff called Plaintiff at home and asked her both professional and personal questions.  Dr. Wisoff then put his daughter on the phone to tell Plaintiff that the way to treat endometriosis is to become pregnant.  On another occasion, Dr. Wisoff gave Plaintiff a book, advising her that it had a section on women who were cursed by God because they have no children and quoting from the Bible.

On January 26, 2009, Plaintiff returned to work.  That day, another surgeon referenced her surgery, so Plaintiff asked Ms. Brillant for a HIPAA investigation, which request was denied.  On February 27, 2009, Plaintiff again requested a HIPAA investigation but was told that she was being paranoid and that an investigation would result in the termination of employees.  On March 5, 2009, Plaintiff again requested a HIPAA investigation, and Ms. Brillant told Plaintiff that she was aware of Ms. Blate's past HIPPA violations and assured Plaintiff that Ms. Blate was going to be fired for reasons unrelated to accessing Plaintiff's chart.  In March 2009, Ms. Blate accessed Plaintiff's chart again, which was also revealed by the later investigation.

In June 2009, Plaintiff met with an administrator at NYU, Maria Corbo, and spoke about her concerns regarding the HIPAA violations and NYU's refusal to investigate.  At this time, Ms. Corbo initiated a HIPAA investigation for Plaintiff.

In the fall of 2009, a secretary at NYU told Plaintiff that another secretary at NYU had told her that Plaintiff was a virgin.  Around this same time, other co-workers began talking negatively about Plaintiff and her medical issues, and various doctors asked Plaintiff how she was feeling and whether she was having any more surgeries.  On October 28, 2009, Plaintiff filed a complaint with Ms. Corbo and the NYU HIPAA compliance officer.

In November 2009, Plaintiff started looking for other placements at NYU.  Then, in December 2009, Plaintiff met with Ms. Corbo and the HIPAA compliance officer again and told them about all of the people Plaintiff suspected had accessed her medical chart illegally.  Ms. Corbo and the HIPAA compliance officer commented that they could not fire the whole hospital but would look into whether Ms. Blate had accessed Plaintiff's chart.

On January 4, 2010, Dr. Wisoff told Plaintiff that Ms. Blate was on a leave of absence due to personal space issues.  Shortly thereafter, Ms. Blate was fired.

Around this same time, however, Plaintiff's treatment at NYU became worse.  In February 2010, Dr. Wisoff mentioned the movie *The 40-Year-Old Virgin* to Plaintiff.  As well, a secretary at NYU asked Plaintiff whether she had fibroids and why she was not pregnant yet, then encouraged her to become pregnant.  In February or March 2010, Plaintiff found a used pregnancy test on her desk, which she believes to have been left by Ms. Blate.  Plaintiff also found red jelly smeared on the toilet seat in the office bathroom, which she also believes was left by Ms. Blate.  The comments directed at Plaintiff by her co-workers inquiring about and encouraging pregnancy continued repeatedly for at least seven months.

6

In February 2010, an anesthesiologist at NYU advised Plaintiff that she had seen Ms. Blate, who had said she would be returning to the hospital soon.  Then, in March 2010, a hospital vendor advised Plaintiff that she had seen Ms. Blate in the hospital lobby wearing scrubs and an ID and that Ms. Blate had said she had been hired as a nurse educator.  In April 2010, another nurse at NYU also told Plaintiff that she had seen Ms. Blate in the hospital.  Plaintiff would find out later from Lisa Robins, a Medtronic representative, that Ms. Blate had been hired to work at NYU for Medtronic as a nurse educator and vendor fill-in.

In March 2010, Plaintiff advised Ms. Brillant of Ms. Blate's presence in her work environment.  Ms. Brillant responded that Ms. Blate was not allowed on campus and promised Plaintiff that she would be safe.  Around this time, Ms. Brillant asked Plaintiff to transfer to her office and work with her.

In March or April 2010, Plaintiff began seeing Ms. Blate around the hospital.  Plaintiff called NYU security, who advised Plaintiff to call the New York City Police Department ("NYPD") if she saw Ms. Blate again.  In April 2010, Ms. Blate called the office to see if Plaintiff was there and say that she was on her way over.  At this time, Plaintiff called NYU security, who advised her again to call the NYPD.  Plaintiff called the District Attorney's Office and was advised that she needed a protective order, but needed to call the police in order to get one.

On April 8, 2010, Plaintiff met with the NYU HIPAA compliance office and made another complaint about Ms. Blate, mentioning the HIPAA violations as well as the fact that Ms. Blate was coming to the hospital, causing Plaintiff to vomit and faint.  Plaintiff asked when and how many times Ms. Blate had accessed her medical chart, but was denied a response.  Plaintiff

did receive confirmation that Ms. Blate was fired for having accessed Plaintiff's medical chart numerous times and that there was an ongoing investigation.

On April 10, 2010, after seeing Ms. Blate at NYU again, Plaintiff told a surgical resident that she was unable to be in certain areas of the hospital due to Ms. Blate's presence and asked him to notify her when Ms. Blate was gone. Plaintiff researched hospital policies, which stated that nurse educators working for vendors, such as Ms. Blate, are not allowed to be in the operating rooms and are not allowed access to patient information. Plaintiff advised the HIPAA compliance office staff of these policies.

In April 2010, NYU's human resources and legal department sent a letter to Medtronic stating that Ms. Blate was not allowed on the NYU campus. However, Plaintiff and others continued to see Ms. Blate at the hospital.

Also in April 2010, Plaintiff advised Dr. Wisoff that she was going to visit a male friend in Europe. Dr. Wisoff told Plaintiff that he wanted to know the moment she conceived, which Plaintiff responded was disgusting. About a month later, in a conversation with Plaintiff, Dr. Wisoff again brought up *The 40-Year-Old Virgin*. In this same conversation, Dr. Wisoff compared sexual activity to petting something furry for the first time, which embarrassed Plaintiff.

Dr. Wisoff used sexual innuendo in front of Plaintiff on other occasions. For example, he stated that things were going to get sticky because he was sitting around masturbating while waiting for an operating room. Dr. Wisoff also told Plaintiff that he recognized her wiggle when she walked. Additionally, Dr. Wisoff touched Plaintiff's hand inappropriately when he reached for items from her.

8

In June 2010, Nicole Delts in human resources at NYU both called and sent a letter to Medtronic, informing Medtronic of the reason for Ms. Blate's termination from NYU.  In July 2010, Plaintiff met again with Ms. Brillant and complained about Ms. Blate's presence at the hospital, saying that it was making Plaintiff physically ill.  Ms. Brillant responded that Ms. Blate was not allowed on campus and that she had been informing others of this.

Around this time, a new co-worker of Plaintiff's, Jessica Lessing, said that she had lied on her resume and that she was hired only due to the fact that she was Jewish.  Dr. Wisoff also stated that Ms. Lessing would not have been hired if she were not Jewish.  Moreover, Dr. Wisoff joked that Plaintiff was the only Catholic allowed in the hospital.  Some of Plaintiff's co-workers asked Plaintiff about whether growing up in a Catholic household was difficult.  Many co-workers, with the acquiescence of Plaintiff's supervisors, also made fun of Plaintiff's Catholic beliefs, including her views on abortion.

On August 5, 2010, Plaintiff saw Ms. Blate in an operating room.  The resident doctor had tried to warn Plaintiff of Ms. Blate's presence using the hospital phones.  Another co-worker also confirmed seeing Ms. Blate in the operating room on that day.  Thereafter, Dr. Wisoff confirmed that Ms. Blate was working as a vendor and would be around the staff.

Dr. Wisoff then changed Plaintiff's schedule to coincide with days that Ms. Blate was scheduled to be in the operating room.  Plaintiff explained that she could not work alongside Ms. Blate in the operating room because her presence affected Plaintiff both physically and emotionally.  Dr. Wisoff commented that he could see that Plaintiff was upset and then hugged her, telling her that everything would be okay.  At this point, Plaintiff vomited.  On August 23, 2010, Plaintiff found a copy of a positive recommendation for Ms. Blate, endorsed by Dr. Wisoff, on her own desk.

On August 30, 2010, Ms. Blate called looking for Plaintiff and then came to Plaintiff's office.  Plaintiff called NYU security, who told her to call 911.  NYU security then showed up and interviewed Plaintiff.

Thereafter, NYU Employee Health representative Helen Ruddy removed Plaintiff from work due to a work-related illness.  A crisis counselor stated that Plaintiff had been abused.  Plaintiff then received harassing emails from Ms. Brillant and her assistant about Plaintiff being out of work.  Another co-worker, also upon hearing of Plaintiff's sick-leave, mentioned to some NYU secretaries that Plaintiff was "fucking useless" and the hospital should "just get rid of" her.  In October 2010, Dr. Wisoff's wife sent an email to the office staff about Plaintiff and her medical issues, including when Plaintiff saw the doctor.

In September or October 2010, Plaintiff received a meeting request via email from Ms. Delts.  Plaintiff responded that she had received both medical and legal advice not to enter the NYU campus and that she would not speak to anyone at NYU without her lawyer.  Ms. Delts advised Plaintiff that Plaintiff's lawyer would not be allowed in the meeting.  An NYU representative also contacted Plaintiff to find out if she was taking worker's compensation, medical leave or another type of absence and then told her to sit tight because her situation was unique.

In October 2010, Plaintiff went to a worker's compensation hearing in which the judge ruled that Plaintiff had prima facie post-traumatic stress disorder ("PTSD") and worked in a hostile environment.  In December 2010, Plaintiff requested a copy of her professional file, which request was delayed but eventually granted.

In late 2010, Lisa Robins, a Medtronic employee, learned the story of Ms. Blate's termination from NYU.  Then, in January 2011, NYU notified Medtronic again via phone and letter of Ms. Blate's termination by NYU and the reasons why.

Also in January 2011, Plaintiff appeared in court again, where Ms. Brillant lied under oath.  In March 2011, NYU appealed the worker's compensation judge's decision.  Plaintiff's attorney then submitted an opposition to the appeal, which is currently pending.

In April 2011, Plaintiff learned that her office received two strange calls from a female caller inquiring about Plaintiff's duties and schedule.  This news made Plaintiff physically ill.  Also in April 2011, Plaintiff's doctor sent a note extending her leave, which NYU confirmed receiving.  Around this same time, two co-workers called Plaintiff "loony tunes," "a head case" and "a nut job."  Also around this same time, Dr. Wisoff, his wife and other NYU employees discussed Plaintiff's situation.

In June 2011, Dr. Wisoff began interviewing people to replace Plaintiff.  Also in June 2011, while Plaintiff was on sick-leave and the worker's compensation litigation was pending, NYU terminated Plaintiff's employment.

## II.    Standard of Review

### A.  Motion to Dismiss

On a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party.  *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 284 (2d Cir. 2013).   To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. While "'detailed factual allegations'" are not necessary, the pleading must be supported by more than mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

Rule 8 of the Federal Rules of Civil Procedure "requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555) (alteration in original). Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal quotation marks omitted).

## B. Summary Judgment

Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. See *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  *See Celotex,* 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  *See id.* at 322.  In satisfying this burden, the non-moving party cannot rely merely on allegations or denials of the factual assertions of the moving party.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.  Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  The non-moving party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts.  *See Celotex,* 477 U.S. at 324.  Furthermore, to demonstrate a genuine dispute as to the material facts, the non-moving party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor.  *See Anderson*, 477 U.S. at 242, 248.

### III.   Discussion

#### A.  Claim for Negligent Supervision or Retention against Medtronic

The Complaint asserts a claim against Medtronic for negligent supervision or retention. "To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship . . .; (2) that the employer 'knew or should have

13

known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence . . .; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (2d Dep't 1997) (citations omitted).

The standard elements of negligence under New York law are: "'(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)).

### i. Motion to Dismiss

Medtronic moves to dismiss on the ground that the allegations contained in the Complaint are insufficient to state a claim.  However, the allegations in the Complaint are sufficient, as the Complaint pleads factual content, accepted as true, which allows the Court to draw the reasonable inference that Medtronic is liable.

The Complaint alleges that Ms. Blate was employed by Medtronic, that Ms. Blate's wrongdoing was committed in the workplace, and that Medtronic knew of Ms. Blate's propensity to commit HIPAA violations and to otherwise harass Plaintiff.  Additionally, the Complaint pleads a duty on the part of Medtronic to provide a safe work environment and properly supervise its employees; breach of this duty by allowing Ms. Blate to continue to work around Plaintiff; and injury to Plaintiff in the form of PTSD.

Medtronic argues that the Complaint fails to provide factual support for the allegation that Medtronic had knowledge of Ms. Blate's propensity for wrongdoing.  This is incorrect.  The Complaint alleges facts that allow the Court to infer that Medtronic was aware of Ms. Blate's

14

propensity for wrongdoing.  Specifically, the Complaint alleges that 1) in April 2010, NYU's human resources and legal department sent a letter to Medtronic stating that Ms. Blate was not allowed on the NYU campus; 2) in June 2010, Ms. Delts in human resources at NYU both called and sent a letter to Medtronic, informing Medtronic of the reason for Ms. Blate's termination from NYU; 3) in late 2010, Lisa Robins, a Medtronic employee, learned the story of Ms. Blate's termination from NYU; and 4) in January 2011, NYU notified Medtronic again via phone and letter of Ms. Blate's termination by NYU and the reasons therefor.

Medtronic argues that the allegations concerning these communications are not specific enough to infer that Medtronic knew about Ms. Blate's HIPAA violations and other harassing behavior.  This argument is incorrect.  The Complaint alleges that Ms. Blate was fired for accessing Plaintiff's medical chart and that the letters to Medtronic informed of the reasons Ms. Blate was fired.  Therefore, it is logical to infer that the letters contained information about Ms. Blate's HIPAA violations.  It is also logical to infer that a letter stating that Ms. Blate was not allowed on the NYU campus at all communicated to Medtronic that Ms. Blate had committed a serious violation.

Medtronic also argues that because the Complaint fails to specify who at Medtronic received the communications from NYU, knowledge of the communications cannot be imputed to Medtronic itself.  This argument also fails.  The Complaint alleges that NYU informed Medtronic.  Furthermore, the Complaint also alleges that Medtronic is a vendor that does business with NYU, and it can be inferred that if NYU's human resources and legal department sent letters to Medtronic, these letters were sent to persons with a duty to inform the company of their contents.

Additionally, Medtronic argues that the Complaint fails to allege what Medtronic did or did not do that was negligent and fails to tie this alleged negligence to Plaintiff's injuries.  This is incorrect.  The Complaint alleges that Medtronic employed Ms. Blate and continued to assign her to NYU after Medtronic was informed that Ms. Blate was not welcome on the NYU campus and that she had been terminated for HIPAA violations.  The Complaint also alleges that Plaintiff suffered from PTSD due in large part to Ms. Blate's harassment of her.  Therefore, Medtronic's motion to dismiss this claim is denied.

### ii.  Motion for Summary Judgment

### 1.  Conversion

Medtronic requests that, if the claim against it cannot be dismissed on the pleadings, the Court convert its motion to one for summary judgment.  The Court will do so.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

"Accordingly, a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule requires that the court give sufficient notice to an opposing party and an opportunity for that party to respond."  *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (internal quotation marks omitted).  "Ordinarily, formal notice is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable

opportunity to meet facts outside the pleadings." *Id.* (alterations in original) (internal quotation marks omitted).

Here, conversion is proper because Medtronic provided Plaintiff with notice in its motion papers that the Court might treat Medtronic's motion to dismiss as a motion for summary judgment. *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 573 (2d Cir. 2005) (holding that the plaintiff had notice where the defendant's motion sought summary judgment as an alternative).

## 2.  Merits

Medtronic moves for summary judgment dismissing the claim against it on the ground that Medtronic was not Ms. Blate's employer. However, summary judgment is not appropriate as genuine questions of material fact exist.

One of the elements of a claim for negligent retention or supervision under New York law is an employee-employer relationship between the tortfeasor and the defendant. *Ehrens*, 385 F.3d at 235; *accord Sandra M. v. St. Luke's Roosevelt Hosp. Center*, 823 N.Y.S.2d 463, 467 (2d Dep't 2006). Medtronic presents evidence, in the form of an affidavit, that Ms. Blate was never employed by Medtronic, but that she was employed by the temporary staffing agency ConsignMed, which contracted with Medtronic for Ms. Blate to perform temporary assignments. Plaintiff does not submit conflicting evidence on this point sufficient to raise a genuine question of material fact.[2]

---

[2]  Plaintiff claims in her affidavit that Ms. Blate was listed as a provider on Medtronic's website. The referenced webpage does list Ms. Blate's name; however, it does not identify her as a Medtronic provider, but as a signatory to a request for New York Medicaid and the New York Legislature to increase reimbursements to physicians and for high-tech therapies involving implantable devices. *See* Medtronic, http://www.medtronic.com/neuro/advocacy/getinvolved-ny-medicaid.html (last visited June 24, 2014).

However, even if it is undisputed that Ms. Blate was hired by ConsignMed, which in turn contracted with Medtronic for Ms. Blate to perform temporary assignments, this does not preclude Medtronic from being considered Ms. Blate's employer.

The loaned servant doctrine provides that "an employee directed or permitted to perform services for another 'special' employer may become that employer's employee while performing those services." *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 349 (S.D.N.Y. 1984) (citation omitted); *accord Blackburn v. Gor-Mac Elec., Inc.*, 667 N.Y.S.2d 549, 550 (4th Dep't 1997). The key factor in determining whether the loaned servant doctrine applies is "the 'special' employer's exclusive right to supervise the employee's work during the period of temporary service." *Amarnare*, 611 F. Supp. at 349; *accord O'Brien v. Garden Way Mfg., Inc.*, 421 N.Y.S.2d 729, 730 (3d Dep't 1979).

Under the loaned servant doctrine, "a person whose salary is paid by one entity while his services are engaged on a temporary basis by another is an employee of both entities." *Amarnare*, 611 F. Supp. at 349 (citation omitted). For example, in *Amarnare*, the court held that a temporary employee was employed by both her staffing agency, Mature Temps, and the company at which she worked on a temporary basis, Merrill Lynch. *See id.* The *Amarnare* court reasoned that even though the temporary employee was "paid directly by Mature Temps," she was "subject to the direction of Merrill Lynch in her work assignments, hours of service, and other usual aspects of an employee-employer relationship" and that "Merrill Lynch had the right to discharge [her] and to request a replacement from Mature Temps if it found [her] services unsatisfactory." *Id.* at 348-49.

Also, under the joint employer doctrine, an employee may be "formally employed by one entity," but "assigned to work in circumstances that justify the conclusion that the employee is at

18

the same time constructively employed by another entity." *Arculeo v. On-Site Sales &
Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005). "A joint employer relationship may be found
to exist where there is sufficient evidence that the [defendant] had immediate control over the
other company's employees." *N.L.R.B. v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994).

"Relevant factors include commonality of hiring, firing, discipline, pay, insurance,
records, and supervision." *Id.* However, "[t]he extent of the employer's right to control the
means and manner of the worker's performance is the most important factor[,]" and other factors
"are then of marginal importance." *Amarnare*, 611 F. Supp. at 348.

"As a functional matter, courts evaluate whether a joint employer relationship exists by
considering the control that [the employers] exercise over the employee in setting the terms and
conditions of the employee's work." *Sosa v. Medstaff, Inc.*, No. 12 Civ. 8926, 2013 WL
6569913, at *3 (S.D.N.Y. Dec. 13, 2013) (alteration in original) (internal quotation marks and
citation omitted); *see also Adams v. Debevoise & Plimpton*, No. 03 Civ. 3015, 2004 WL
1737826, at *2 (holding that the defendant's "control of the conditions of . . . employment . . .
establishes it as a joint employer").

"The joint employer doctrine has been applied to temporary employment or staffing
agencies and their client entities." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009);
*see, e.g.*, *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 146-48 (2d Cir.
2008); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 288 (S.D.N.Y. 1999); *Adams*, 2004 WL
1737826, at *2; *Amarnare*, 611 F. Supp. at 348-49.

For example, in *Barfield*, the hospital where the temporary employee was assigned to
work by her staffing agency was deemed to be her joint employer. *See Barfield*, 537 F.3d at 147.
The *Barfield* court reasoned that "when Barfield provided nursing assistance, she was directly

supervised only by Bellevue staff"; "the same work [was] routinely performed by Bellevue's full-time employees, with temporary agency-referred workers being hired to fill in when regular staff [were] unavailable"; and "the record evidence convincingly demonstrate[d] Bellevue's control over Barfield when she worked at the hospital as a temporary member of its staff of health care professionals." *Id.* at 146-47.

"When an employer has the right to control the means and manner of an individual's performance . . . an employer-employee relationship is likely to exist." *Amarnare*, 611 F. Supp. at 348. Ultimately, determination of whether an entity may be considered an employer is "essentially a factual issue." *N.L.R.B.*, 38 F.3d at 94 (internal quotation marks and citation omitted); *accord O'Brien*, 421 N.Y.S.2d at 730. Therefore, in order to determine whether Medtronic can be considered Ms. Blate's employer, material questions of fact must be answered, including, among others:

1. The extent of Medtronic's right to control the means and manner of Ms. Blate's performance;

2. The extent of Medtronic's right to control the terms and conditions of Ms. Blate's work;

3. The extent to which Medtronic directed Ms. Blate's work assignments and hours of service;

4. The extent to which Medtronic supervised Ms. Blate's work; and

5. Whether Medtronic had the right to discharge Ms. Blate and to request a replacement if it found her services unsatisfactory.

Medtronic argues that companies that use temporary staffing agencies do not have notice of the propensities of individuals hired by those agencies, relying on *Yildiz v. PJ Food Service,*

*Inc.*, 918 N.Y.S.2d 572 (2d Dep't 2011).  However, *Yildiz* did not hold that a company that uses a temporary staffing agency can *never* be aware of the propensity of an individual hired in this manner, or even that the company was unaware of the individual's propensity *due to* the existence of the staffing agency, but simply that there was no evidence in that case that the company was in fact aware.  *Id.* at 574.

In *Sandra M.*, another case where the tortfeasor had been supplied to the defendant by a temporary staffing agency, the court held that the defendant did not have knowledge of the tortfeasor's propensity.  *Sandra M.*, 823 N.Y.S.2d at 467.  However, the *Sandra M.* court stated that even if the defendant could be deemed to have hired the tortfeasor – a question that the court declined to answer – the company still would not have had notice of the tortfeasor's propensities, thus showing that the presence of the temporary staffing agency was not the determining factor in whether notice existed.  *Id.*

What Medtronic knew about Ms. Blate's wrongdoings and when Medtronic acquired this information are also material questions of fact.  Accordingly, Medtronic's motion for summary judgment is denied.

### B.  Claims against NYU

#### i.  Negligent Supervision or Retention

The Complaint also asserts a claim against NYU for negligent supervision or retention. The Complaint sufficiently alleges the elements of this claim, which are stated above.  The Complaint alleges that Ms. Blate was employed by NYU, that Ms. Blate's wrongdoing was committed in the workplace, and that NYU knew of Ms. Blate's wrongdoing due to Plaintiff's repeated complaints.  The Complaint also pleads a duty on the part of NYU to provide a safe work environment and properly supervise its employees; breach of this duty by allowing Ms.

Blate to continue to work around Plaintiff and to access her medical chart; and injury to Plaintiff in the form of PTSD.

NYU argues that the Complaint fails to provide factual support for the allegation that NYU had knowledge of Ms. Blate's propensity for wrongdoing.  This argument is incorrect.  The Complaint contains numerous factual allegations concerning Plaintiff's complaints regarding Ms. Blate.

Specifically, the Complaint alleges that 1) on January 26, February 27 and March 5, 2009, Plaintiff requested a HIPAA investigation; 2) in June 2009, Plaintiff met with Ms. Corbo regarding the HIPAA violations and NYU's refusal to investigate; 3) on October 28, 2009, Plaintiff filed a complaint with Ms. Corbo and the NYU HIPAA compliance officer; 4) in December 2009, Plaintiff met with Ms. Corbo and the HIPAA compliance officer again; 5) in March 2010, Plaintiff advised Ms. Brillant of Ms. Blate's unauthorized presence; 6) in April 2010, Plaintiff called NYU security twice when she saw Ms. Blate; 7) on April 8, 2010, Plaintiff placed another complaint about Ms. Blate with the NYU HIPAA compliance office; 8) in July 2010, Plaintiff again complained to Ms. Brillant about Ms. Blate's presence; and 9) on August 30, 2010, Plaintiff again called NYU security concerning Ms. Blate.

Therefore, NYU's motion to dismiss this claim is denied.

### ii.  Sexual Harassment

#### 1.  *Quid Pro Quo*

The Complaint asserts a claim for *quid pro quo* sexual harassment against NYU under the New York State Human Rights Law ("NYSHRL").  However, the allegations in the Complaint are not sufficient for this claim to survive a motion to dismiss.

Sexual harassment claims under the NYSHRL "are analytically identical to claims

22

brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (internal quotation marks and citation omitted).  "[Q]uid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'"  *Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir. 1994) (quoting 29 C.F.R. § 1604.11(a)(2)) (second alteration in original).

"Accordingly, to establish a prima facie case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment."  *Id.*; *accord Bartle v. Mercado*, 652 N.Y.S.2d 139, 141 (3d Dep't 1997).  "The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances."  *Karibian*, 14 F.3d at 778; *accord Father Belle Cmty. Ctr. v. New York State Div. of Human Rights*, 642 N.Y.S.2d 739, 744 (4th Dep't 1996).

The Complaint fails to allege facts that, if true, would state a claim for *quid pro quo* sexual harassment.  Specifically, the Complaint does not allege that NYU linked any job benefits to the acceptance or rejection of anyone's sexual advances.  Accordingly, NYU's motion to dismiss this claim is granted.

### 2.  Hostile Work Environment

The Complaint also asserts a claim against NYU for sexual harassment under a theory of hostile work environment, but does not specify a specific law.  The allegations in the Complaint are sufficient for this claim to survive a motion to dismiss.

### a. Title VII/NYSHRL

"Hostile work environment . . . claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII." *Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 609 (2d Cir. 2006). The allegations in the Complaint are sufficient under a Title VII/NYSHRL standard.

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted).

The "severe or pervasive" standard requires the plaintiff to show that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). The Supreme Court has "'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The Supreme Court has also held that "a work environment's hostility should be assessed based on the 'totality of the circumstances.'" *Patane*, 508 F.3d at 113 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it

unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

"Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse . . . .'" *Id.* The Second Circuit has "'repeatedly cautioned against setting the bar too high' in this context." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

Here, the Complaint alleges sufficient facts to state a claim for hostile work environment under the Title VII/NYSHRL standard. NYU argues that the Complaint does not allege that Plaintiff was harassed because of her gender, but because of her complaints about HIPAA violations, and that the alleged discrimination was not related to Plaintiff's gender, but to her personal privacy. This argument fails.

First, the Complaint alleges facts from which a reasonable jury could determine, if it found those facts to be true, that Plaintiff was harassed because of her gender. Specifically, the Complaint alleges that Dr. Wisoff, among other NYU employees, harassed Plaintiff repeatedly about, among other things, being a virgin, having gynecological problems and becoming pregnant.

Second, a reasonable jury could find that the harassment consisting of Plaintiff's medical records being illegally accessed was also because of her gender. The medical records at issue were gynecological, and they included details about her sex life, or the lack thereof. It is clear from the allegations in the Complaint that the reason Plaintiff was so worried about her co-workers viewing her medical files was that they contained such personal details. The Complaint also alleges that one reason Ms. Blate, and possibly others, accessed these files was because they

contained potentially salacious material having to do with Plaintiff's sexual anatomy.  In other words, had Plaintiff been a man having surgery to fix, for example, a broken leg, it is likely no one would have spied on the records and then spread rumors about what was in those records.

Third, the specific gender-based harassment is not divorced from the HIPAA violations. The allegations in the Complaint fall roughly into two categories: 1) those concerning Ms. Blate illegally entering Plaintiff's medical records and NYU's failure to handle this matter, and 2) other NYU employees, including Dr. Wisoff, harassing Plaintiff regarding her virginity, future sexual experiences, potential pregnancy and gynecological problems.  However, these two branches of allegations are connected because, according to the Complaint, the confidential information about which Plaintiff was harassed became known to her co-workers due to the illegal viewing of her medical records.

Therefore, because all of the harassment alleged in the Complaint could be found by a reasonable jury to be because of Plaintiff's gender, the Complaint sufficiently alleges conduct that a reasonable jury could find meets the severe and pervasive standard.

### b.  New York City Human Rights Law ("NYCHRL")

The allegations in the Complaint are also sufficient under a NYCHRL standard.  To state a claim for hostile work environment in violation of the NYCHRL, a plaintiff must plead facts showing simply that she was "'treated less well than other employees because of her gender.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S. 2d 27, 39 (1st Dep't 2009)).  "[T]he NYCHRL does not require . . . severe and pervasive conduct," but merely "unwanted gender-based conduct."  *Id.* at 110, 114; *accord Williams*, 872 N.Y.S. 2d at 37-39.

As discussed above, the Complaint alleges facts from which a reasonable jury could determine, if it found those facts to be true, that Plaintiff was treated less well than other employees because of her gender.  Therefore, the Complaint states a claim for hostile work environment under the NYCHRL standard.  Consequently, NYU's motion to dismiss this claim is denied.

### iii.  Age Discrimination (29 USCA 621 & NYSHRL)

Next, the Complaint asserts a claim for age discrimination against NYU under the Age Discrimination in Employment Act ("ADEA") and the NYSHRL.  However, the allegations in the Complaint are not sufficient for this claim to survive a motion to dismiss.  "Employment discrimination claims brought under . . . the NYSHRL . . . are generally analyzed under the same evidentiary framework that applies to . . . ADEA claims."  *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 409 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).

To state a claim for age discrimination, a plaintiff "must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Terry*, 336 F.3d at 137-38 (internal quotation marks omitted).  An age discrimination claim "must permit a court to infer that it is plausible that the plaintiff suffered an adverse employment action because of his age."  *Anderson*, 850 F. Supp. 2d at 409.

Here, the Complaint does not allege sufficient facts to state a plausible claim that NYU terminated Plaintiff or took any other adverse action against her because of her age.  Instead, the Complaint merely asserts in a conclusory fashion that Plaintiff was pressured to resign due to her age, as well as other reasons.  Therefore, NYU's motion to dismiss this claim is granted.

### iv.   Termination to Prevent Pension Benefits

Next, the Complaint asserts a claim against NYU that Plaintiff was terminated in violation of the Employee Retirement Income Security Act ("ERISA").  However, the allegations in the Complaint are not sufficient for this claim to survive a motion to dismiss.

Section 510 of ERISA provides in part: "It shall be unlawful for any person to discharge … a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled . . . ."  29 U.S.C. § 1140.  "Section 510 was designed primarily to prevent unscrupulous employers from discharging . . . their employees in order to keep them from obtaining vested pension rights."  *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1110-11 (2d Cir. 1988).

"An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510."  *Id.* at 1111.  Therefore, a claim fails "where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment."  *Id.* (internal quotation marks and citation omitted).  "ERISA does not guarantee every employee a job until . . . she has fully vested into a company's benefit plan."  *Id.*

Here, the Complaint does not allege sufficient facts to state a plausible claim that NYU's motive in terminating Plaintiff was to keep her from receiving her pension benefits.  The Complaint simply states in a conclusory manner that NYU intended to deprive Plaintiff of ERISA protected benefits and alleges that she was fired shortly before the vesting of her pension.  Therefore, NYU's motion to dismiss this claim is granted.

### v.  Disability Discrimination

The Complaint next asserts a claim against NYU for discrimination on the basis of disability and failure to provide a reasonable accommodation under the NYCHRL.  The allegations in the Complaint are sufficient for this claim to survive a motion to dismiss under the NYCHRL standard.

The NYCHRL defines disability as "'any physical, medical, mental or psychological impairment, or a history or record of such impairment.'"  *Phillips v. City of New York*, 884 N.Y.S.2d 369, 377 (1st Dep't. 2009) (quoting New York City Administrative Code § 8–102[16][a].  The NYCHRL defines reasonable accommodation as "'such accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business.'"  *Id.* (quoting N.Y. Admin. Code § 8–102(16)(a)).

"Under . . . the NYCHRL, it is an unlawful discriminatory practice for an employer, because of an individual's disability, to refuse to hire or to discharge such individual, or otherwise to discriminate against such individual in the terms, conditions and privileges of employment."  *LaCourt v. Shenanigans Knits, Ltd.*, 966 N.Y.S.2d 347 (Table), at *3 (N.Y. Sup. Ct. 2012) (citing N.Y. Admin. Code § 8–107(1)(a)).  "To establish a case of disability discrimination [under the NYCHRL], a plaintiff must show that she suffers from a disability, and the disability caused the behavior for which she was terminated."  *Id.* (citing *Vig v. New York Hairspray Co., L.P.*, 885 N.Y.S.2d 74, 79 (1st Dep't 2009)).

"An employer's refusal to reasonably accommodate an employee's known disability also constitutes discrimination under the . . . NYCHRL."  *Id.* (citing N.Y. Admin. Code § 8–107(15)(a)).  "In order to establish that an employer failed to reasonably accommodate an employee's disability, a plaintiff must show that 1) she was disabled within the meaning of the

statutes; 2) the employer had notice of the disability; 3) she could perform the essential functions of her job, with a reasonable accommodation; and 4) the employer refused to make a reasonable accommodation." *Id.* at *4 (citing *Pimentel v. Citibank, N.A.*, 811 N.Y.S.2d 381, 385 (1st Dep't 2006)).

Here, the Complaint alleges that Plaintiff suffered from PTSD and that NYU was aware of this diagnosis. The Complaint also alleges that Plaintiff was normally very capable at doing her job. Additionally, the Complaint alleges that NYU terminated Plaintiff's employment without attempting to accommodate her disability. Therefore, the allegations in the Complaint are sufficient to survive a motion to dismiss under the standards of the NYCHRL.

NYU argues that this claim should fail because the Complaint does not allege that Plaintiff requested an accommodation. However, the NYCHRL creates "an independent duty to investigate feasible accommodations" and "affirmatively requires that, *even in the absence of a specific request*, an employer 'shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the [employer].'" *Id.* (alteration in original) (emphasis added) (quoting N.Y. Admin. Code § 8–107(15)(a)) (citing *Phillips*, 884 N.Y.S.2d at 382-83).

NYU also argues that this claim should fail because the Complaint fails to allege that Plaintiff could perform the essential functions of her job with a reasonable accommodation. However, drawing all inferences in favor of the non-moving party, as required on this motion, it can be inferred from the allegations in the Complaint that Plaintiff could return to work under the right circumstances. *See Phillips*, 884 N.Y.S.2d at 383 (reasoning that "it is no conclusory 'jump' to infer that plaintiff was claiming she would have been able to return to work" where the

complaint alleged plaintiff "could perform the essential requisites of the job" but was on leave for an illness).

NYU also argues that this claim should fail because NYU granted Plaintiff an extended leave.  "[A]n extended leave[] can be a reasonable accommodation."  *LaCourt*, 966 N.Y.S.2d at *5.  However, under the NYCHRL, "there is no accommodation (whether it be indefinite leave time or any other need created by a disability) that is categorically excluded from the universe of reasonable accommodation."  *Phillips*, 884 N.Y.S.2d at 378.  "At this stage of the proceeding, where plaintiff is entitled to every favorable inference and in the absence of any factual record to show undue hardship," the fact Plaintiff was given an extended leave, during which she was terminated, does not preclude a reasonable jury from finding that NYU failed to reasonably accommodate her.  *Id.*

Therefore, the Complaint states a claim for disability discrimination under the NYCHRL standard, and NYU's motion to dismiss this claim is denied.

### vi.  Sexual Orientation Discrimination

The Complaint next asserts a claim against NYU for discrimination on the basis of sexual orientation under the NYCHRL and the U.S. Constitution.  However, the allegations in the Complaint are not sufficient for this claim to survive a motion to dismiss.

### 1.  NYCHRL

To state a claim for sexual orientation discrimination under the NYCHRL, a plaintiff must allege: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Benussi v. UBS Financial Services Inc.*, No. 12 Civ. 1261, 2014 WL 558984, at *11 (S.D.N.Y. Feb. 13, 2014) (citing *Leibowitz v.*

*Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009)).  These elements are to be "construed more liberally" under an NYCHRL analysis than they would be under a Title VII or NYSHRL analysis.  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).

Here, the Complaint does not allege what Plaintiff's sexual orientation is or how NYU came to know about it.  The Complaint also does not allege any facts giving rise to an inference that NYU terminated Plaintiff, or took any other adverse action against her, due to her sexual orientation.  Instead, the Complaint merely asserts in a conclusory fashion that NYU terminated Plaintiff partly or totally as a result of her sexual orientation.  Therefore, the Complaint fails to state a plausible claim for sexual orientation discrimination even under the liberal standards of the NYCHRL.

### 2.  U.S. Constitution

"Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'"  *U.S. v. Int'l Broth. of Teamsters,* 941 F.2d 1292, 1295 (2d Cir. 1991).  "To qualify as state action, the conduct in question 'must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [State] or by a person for whom [the State] is responsible,' and 'the party charged with the [conduct] must be a person who may fairly be said to be a state actor.'"  *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

Here, the Complaint does not allege any wrongdoing on the part of any person or entity that could be considered a state actor.  Accordingly, the Complaint fails to adequately state a

claim for sexual orientation discrimination under the U.S. Constitution, and NYU's motion to dismiss this claim is granted.

### vii.   Religious Discrimination

Lastly, the Complaint asserts a claim against NYU for discrimination on the basis of religion under the NYCHRL and the U.S. Constitution.  However, the allegations in the Complaint are not sufficient for this claim to survive a motion to dismiss.

## 1.   NYCHRL

To state a claim for religious discrimination under the NYCHRL, plaintiffs must allege that "'(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'"  *Stavis v. GFK Holding, Inc.*, 769 F. Supp. 2d 330, 335 (S.D.N.Y. 2011) (quoting *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006)).

While the Complaint alleges that many of Plaintiff's co-workers made fun of her Catholic beliefs, the Complaint does not allege that Plaintiff's religious beliefs conflicted with any of her employment requirements, nor does it allege that Plaintiff was disciplined for failing to comply with employment requirements that conflicted with her religious beliefs.  Consequently, the Complaint fails to adequately state a claim for religious discrimination under the NYCHRL.

## 2.   U.S. Constitution

As discussed above, in order to state a federal constitutional claim, there must be state action, which is not alleged here.  Accordingly, the Complaint fails to adequately state a claim for religious discrimination under the U.S. Constitution, and NYU's motion to dismiss this claim is granted.

### C. Whistleblower Issue

NYU argues that all of Plaintiff's state law claims should be dismissed because she pleaded a claim for "whistleblower protection" under the New York Labor Law in her FAC. However, this argument fails.

New York Labor Law § 740 (7) states that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law." N.Y. Lab. Law § 740(7) (McKinney).  This "waiver provision applies only to rights and remedies concerning whistleblowing as defined in the Act." *Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 274 (S.D.N.Y. 2001) (determining this standard "after carefully considering the text of the Whistleblower Act as strictly construed by the New York Court of Appeals, its underlying purposes as described in its legislative history, and the important guidance provided by its practice commentaries").

New York's Whistleblower Act protects from "retaliatory personnel action" those employees who report a violation that "creates and presents a substantial and specific danger to the public health or safety."   N.Y. Lab. Law § 740(2) (McKinney).  The Whistleblower Act "does not extend its protections to those who complain of *any* unlawful conduct by the employer." *Collette*, 132 F. Supp. 2d at 268.  "Relief available under the Act, moreover, is limited to specifically-defined statutory remedies." *Id.*

"Accordingly, a plaintiff who seeks protection against retaliation for reporting the kind of specific violations with which the Act is concerned must elect either to invoke the Act as the exclusive means to vindicate this protection, or to pursue some other remedy." *Id.* at 269. However, "[t]he Act leaves unrelated rights and remedies of the employee untouched." *Id.*;

34

*accord Kraus v. Brandstetter*, 586 N.Y.S.2d 269, 270 (2d Dep't 1992) ("Although Labor Law §
740 provides that the institution of an action under the statute constitutes a waiver of the rights
and remedies available under any other contract, collective bargaining agreement, law, rule,
regulation, or remedy under the common law, the waiver only applies to those causes of action
relating to retaliatory discharge.")

"The narrow scope of the statutory right and remedy supports an equally narrow view of
the waiver of rights that is attached to the Act." *Collette*, 132 F. Supp. 2d at 268. "To interpret
the provision broadly assumes that the Legislature wrote an unlimited, and therefore absurd,
waiver provision, leaving it to the court to invent whatever limitation seems to make sense." *Id.*
at 269. "In contrast, interpreting the waiver . . . as symmetrical with the right created by the Act
supplies a limitation that grows organically from the statute itself, rather than from the court's
notion of good policy, and explains the absence of limiting language from the waiver clause." *Id.*

Furthermore, in further support of the narrow interpretation of the waiver, the practice
commentary accompanying the Whistleblower Act states: "The compulsory waiver provision of §
740(7) . . . might appropriately be read to mean that the 'rights and remedies' which are 'deemed'
waived are those for retaliation as such rather than all rights arising out of the incident involved."
*Id.* at 272 (citation omitted).

Limiting the waiver provision to only those rights and remedies addressed by the
Whistleblower Act also "effectuates the Act's remedial purpose by permitting employees to
pursue legitimately independent claims, while prohibiting claims that duplicate or overlap the
statutory remedies for retaliation on account of whistleblowing activity alone." *Id.* at 274.

The public policy goal of the Whistleblower Act was described by the governor as such:
"'Encouraging employees to bring violations to the attention of their employers and shielding

them from employer retaliation if they disclose wrongful conduct to authorities, will protect the welfare of the people of this State, promote enforcement of the law, and give needed protection to employees who wish to act as law-abiding citizens without fear of losing their jobs.'" *Id.* at 271 (quoting Memorandum from Governor Mario Cuomo on signing the Whistleblower Act (1984)).

Therefore, "requiring the employee, as the price of asserting whistleblower protection, to waive any rights he might have under independent causes of action (such as battery, or defamation, or sexual harassment, or employment discrimination) that may have arisen from the same course of employer conduct as the retaliatory firing, will create a disincentive to invoking the Act's protection, thus in turn deterring the very whistleblowing conduct that the Act intends to encourage." *Id.*

Plaintiff's remaining claims are for: 1) negligent retention and supervision; 2) hostile work environment sexual harassment; and 3) disability discrimination.   These claims are not duplicative of her previously withdrawn whistleblower claim.  Even though these claims arose from "the same course of conduct" and some of "the very same actions" as the whistleblower claim; for each of these remaining claims, "the employer's wrongful actions invaded different interests of the employee, which are protected by different bodies of law, for different reasons" than those pertaining to the whistleblower claim.  *Id.* at 265.  Accordingly, these claims have not been waived.

## IV.   Conclusion

For the reasons discussed above,

- Defendant Medtronic's motion to dismiss is DENIED.

- Defendant Medtronic's motion for summary judgment is DENIED.

- Defendant NYU's motion to dismiss the following claims is DENIED:  negligent retention and supervision, hostile work environment sexual harassment, and disability discrimination.

- NYU's motion to dismiss the following claims is GRANTED: quid pro quo sexual harassment, age discrimination, termination to prevent pension benefits, sexual orientation discrimination, and religious discrimination.

The Clerk of Court is directed to close the motions at docket numbers 21 and 24.

SO ORDERED.

Dated: June 27, 2014
        New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**